Zachary Lawrence, Esq. (NY Bar: 5798202)
Lawrence Law Firm PLLC
598 E Main Street
Little Falls, NY 13365
Telephone: 202-468-9486
Email: zach@zlawpllc.com

Attorney for Plaintiff,
ROBBIE D. WHITE

## UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBBIE D. WHITE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WEST SACRAMENTO; COUNTY OF YOLO; Sergeant STEFAN IWANICKI, *in his official and individual capacity*, Officer NATHANN OGDEN, *in his official and individual capacity*; Officer CHRISTOPHER COBB, *in his official and individual capacity*; Officer JASON MAHAFFEY, *in his official and individual capacity*; Officer MATTHEW MONTEZ, *in his official and individual capacity*; Officer DANIEL BOEHLE, *in his official and individual capacity*, Officer ANDREY KINDA, *in his official and individual capacity*; Officer AUSTIN SCHREIBER, *in his official and individual capacity*; Deputy DAVID SANTOS*, in his official and individual capacity*; Sheriff TOM LOPEZ, *in his official capacity* and Doe 1<br>Defendants. | No.: 2:20-cv-02383 MCE AC<br><br>**SECOND AMENDED COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

　　　Plaintiff Robbie D. White, for his Complaint against the City of West Sacramento; the County of Yolo, Sergeant Stefan Iwanicki ("Sgt. Iwanicki"), Officer Nathann Ogden ("Officer Ogden"), Officer Christopher Cobb ("Officer Cobb"), Officer Jason Mahaffey ("Officer Mahaffey"), Officer Matthew Montez ("Officer Montez"), Officer Daniel Boehle ("Officer

Boehle"), Officer Andrey Kinda ("Officer Kinda"), Officer Austin Schreiber ("Officer Schreiber"), Deputy David Santos ("Deputy Santos"), Sheriff Tom Lopez ("Sheriff Lopez") and Does 1, demands a jury trial and alleges as follows:

## NATURE OF THE ACTION

1.     This action arises under Title 42 of the United States Code, Section 1983. Plaintiff brings this action to address Defendants' violations of his Fourth, Fourteenth, and First Amendment rights relating a series of incidents taking place July 2, 2019 and extending into the following day.

2.     On July 2, 2019, Plaintiff (on occasion "Mr. White"), visited the City of West Sacramento Police Department (the "Department"), to inquire about an unexplained voicemail left on Mr. White's telephone from the Yolo County dispatcher's office.

3.     This simple task, resulted in Mr. White's false arrest, detention, imprisonment, humiliation, and significant injury—and all of this absent cause.

## JURISDICTION

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under 42 U.S.C. §1983. This Court has supplemental jurisdiction over Mr. White's state law claims pursuant to 42 U.S.C. § 1367.

## VENUE

5.     Venue is proper in this District under 28 U.S.C. 1391(b)-(c) because a substantial part of the events giving rise to the claims brought by Plaintiff occurred in this District and the Defendants are located in the District.

## PARTIES

6.     Defendant City of West Sacramento is a public entity established under the laws and the State of California, and owns, operates, manages, directs and controls the City of West Sacramento Police Department.

7.     Defendant County of Yolo is a political subdivision of the State of California,

created and existing by virtue of the laws of the State of California.

8.    Defendant Stefan Iwanicki, at all material times was employed as a sergeant by the Department; Defendant Stefan Iwanicki is sued in his individual and official capacity.

9.    Defendant Nathann Ogden, at all material times was employed as a police officer by the Department; Defendant Nathann Ogden is sued in his individual and official capacity.

10.  Defendant Christopher Cobb, at all material times was employed as a police officer by the Department; Defendant Christopher Cobb is sued in his individual and official capacity.

11.  Defendant Jason Mahaffey, at all material times was employed as a police officer by the Department; Defendant Jason Mahaffey is sued in his individual and official capacity.

12.  Defendant Matthew Montez, at all material times was employed as a police officer by the Department; Defendant Matthew Montez is sued in his individual and official capacity.

13.    Defendant Daniel Boehle, at all material times was employed as a police officer by the Department; Defendant Daniel Boehle is sued in his individual and official capacity.

14.  Defendant Andrey Kinda, at all material times was employed as a police officer by the Department; Defendant Andrey Kinda is sued in his individual and official capacity.

15.  Defendant Austin Schreiber, at all material times was employed as a police officer by the Department; Defendant Austin Schreiber is sued in his individual and official capacity.

16.  Defendant Sheriff Tom Lopez is sued in his official capacity and was at all material times employed by Yolo County.

17.  Defendant Deputy Santos is sued in his individual and official capacity and was at all times employed by the Yolo.

18.  The true name and capacity of Defendant sued herein as Doe 1 is unknown to Plaintiff who therefore sues said Defendant by such fictitious name. If granted leave to amend, Plaintiff will amend this complaint with the true name of Doe 1, when such is

ascertained. Doe 1, was an agent/employee of the Yolo County Sheriff's department.

19.   All Defendants were at all pertinent times acting under color of law.

20.   Plaintiff is a non-white male, currently aged 61; during the times pertinent to the instant Complaint, Mr. White was 58.

21.   Mr. White spent a large portion of his life in public service, having served honorably in the United States Navy as an air traffic controller and thereafter working as a correctional officer in San Quentin prison prior to a shoulder injury[1] cutting his public service short. After having spent a large portion of his professional life in public service, Mr. White chose to volunteer his time to various public causes in his retirement.

22.   Mr. White—prior to July 2, 2019—was highly visible and active in the West Sacramento community and the Yolo County community more broadly. Among other activities, Mr. White founded a nonprofit aimed at "at-risk" youths coupling Mr. White's experience in naval aviation with the benefits of structure and education in the lives of disadvantaged youths; additionally, Mr. White actively participated in the political efforts of the local retirement community working for the American Association of Retired Persons (the "AARP") "Capitol Response Team."

## FACTUAL BACKGROUND

### Personal Background and Biography

23.   Prior to the July 2, 2019, arrest and its fallout, Mr. White by any metric had been an active member of the community in West Sacramento; his life consisted in large part in his participation in various volunteer organizations and charities.

24.   Mr. White actively participated in local and state efforts of the AARP; Mr. White served in a volunteer capacity promoting the CalSavers program (Senate Bill No. 1234). Shortly after the publication of Mr. White's arrest, Nina Weer and Blanca Castro

---

[1] Mr. White's acromioclavicular joint was injured in the early 1990s and Mr. White suffered a scapular tear in the line of duty, making it impossible for him to continue his career in the California corrections system. By 2008, Mr. White had regained full use and movement of the limb.

contacted Plaintiff and terminated his relationship with the AARP Capitol Response Team.

25.   Mr. White has been unable to rekindle his relationship with the AARP, other than as a simple member.

26.   On information and belief, Mr. White's termination from the AARP Capitol Response Team was caused solely by the publication of his arrest.

27.   Mr. White remains a member in good standing with the Independent Order of Odd Fellows—a fraternal organization organized in "lodges"—; however, his standing within the lodge has suffered. Mr. White no longer physically attends meetings; he solely donates money to the lodge in support of its charitable ventures. The sole reason for Mr. White's diminished role in the lodge is his "arrest" and the "charges" brought against Mr. White.

28.   Mr. White, further, played a prominent role in the local Meals on Wheels, West Sacramento Chapter. Mr. White, on behalf of Meals on Wheels, worked closely with State Senator Richard Pan. Mr. White, further, pleaded on the State Assembly and State Senate floors to raise contributions made to Meals on Wheels. Mr. White can simply no longer work in this capacity: his name has been tarnished, his relationships irreparably damaged, and participation within organization adversely impacted.

29.   Closer to home, Mr. White's ability to run his own charitable organization, Wings of Loving Hearts Foundation, has been significantly damaged due to Mr. White's arrest, but more particularly the publication of the crimes with which Mr. White was charged. To wit, Mr. White's life is dependent on his image and reputation, being charged with public intoxication and resisting arrest does unspeakable harm to this deserved image of probity and altruism.

30.   Mr. White, prior to the relevant incidents of July 2-3, 2019 was actively recruiting local school board members to sit on the board of his charity, Wings of Loving Hearts Foundation.

31. Closer, even still, Mr. White began receiving phone calls telling him to stay out of West Sacramento.

32. Mr. White feared continued harassment and felt unsafe in his home in, located in West Sacramento, and began living with friends.

33. To date Mr. White has not resided in his home for approximately thirty-three months. His home remains vacant—this at great expense.

34. Needless to say, the peace of mind, sense of safety, and general well-being which Mr. White had hitherto enjoyed, has simply been destroyed—all of this because of the acts of the City and Police Defendants and Yolo County Defendants.[2]

35. Further, Mr. White's charitable and community service aspirations, although modest, have been frustrated by the issuance and publication of the charges leveled against him.

36. In short, the entirety of what constituted Mr. White's retirement and philanthropic life has in one way or another been taken away from him. While Plaintiff endeavors to enjoy his "golden years," much of what were foundational activities were dependent on Mr. White's hitherto unimpeachable reputation in the community and due to the Defendants actions these activities are now are impossible.

## Incident and Arrest of July 2, 2019

37. On June 29, 2019, Plaintiff received a voice message from the Yolo County Dispatcher, stating that there were West Sacramento Police officers outside of Plaintiff's home, advising the Plaintiff that the officers needed to "talk to [Mr. White.]"

38. Mr. White was not at home at the time of the call, and upon inspection found nothing out of place. He called the Yolo County Dispatcher to find out exactly why officers were waiting outside his home; the dispatcher referred Mr. White to the Department.

---

[2] Mr. White refers to the City of West Sacramento, Sgt. Iwanicki, Officer Ogden, Officer Cobb, Officer Mahaffey, Officer Montez, Officer Boehle, Officer Kinda, Officer Schreiber, and collectively as the "City and Police Defendants"; Mr. White refers to Sheriff Lopez, Deputy Santos, Doe 1, and the County of Yolo collectively as the "Yolo County Defendants."

39.   Mr. White immediately called the Department and was told that the officers who were assigned to the call had just gone home and would not be working again for three days' time.

40.   After pleading for a more concrete reason, Mr. White was informed "it was just a warning" and Plaintiff stated he would go to the department to retrieve information relating to the call concerning his property.

41.   On July 2, 2019, Mr. White went to the West Sacramento Police Department to inquire about the call. He was accompanied by a friend Cynthia Fleming ("Ms. Fleming").

42.   Mr. White spoke with a records clerk, on information and belief Julie Durrington, for a few minutes before being interrupted by a man wearing civilian clothing, James Arthur King ("Mr. King").

43.   Mr. White's conversation consisted, in essence of him requesting the records of calls relating to 3440 Coyote Road, West Sacramento—the address of his home—her checking and then insisting that there were no records of calls or officers sent to Mr. White's home. Mr. White was insistent.

44.   Mr. King, a Caucasian male, interrupted, growing more hostile, loud, and commanding without apparent reason. Mr. King proceeded to threaten Mr. White. Stating "You don't know who I am and what I . . ." Mr. White did not hear or cannot remember what was said.

45.   The man's demeanor, dress, and actions caused Mr. White concern, for himself and others present in the station—the man had no apparent business in the Department and he appeared unkempt and volatile. Mr. White generally alerted those present that Mr. King had threatened Plaintiff.

46.   Mr. King is Caucasian. He was not handcuffed, arrested, or removed from the building, or touched.

47.   During the entirety of his conversation with the clerk Mr. White remained, though

insistent, calm, polite, and civil.

48.   At no time did Mr. White utter any obscenity, shout, or yell, at either the clerk or the man who interjected.

49.   Mr. White did not appear disheveled or intoxicated; the clothing Mr. White was wearing at the time of the incident was clean business attire. Mr. White did not smell of alcohol: Mr. White had not consumed any alcohol.

50.   Officer Mahaffey approached Mr. White *asked* Mr. White to speak outside; Mr. White declined stating "You can ask me what's what—I'm not leaving—this man threatened my life." Mr. White's interaction with Officer Mahaffey, up to this point lasted a total of 24 seconds. Mr. White had declined Officer Mahaffey's request to speak outside. At no time was Mr. White Ordered to leave.

51.   As Mr. White was finishing this sentence, Officer Ogden entered the lobby through a side door, forcefully grabbing Mr. White's right arm, twisting it to reposition it behind Mr. White's back, simultaneously Officer Cobb, placed Mr. White's right arm in an "arm lock" and Officer Mahaffey violently forced Mr. White's left arm behind Mr. White's back.

52.   Immediately, Mr. White asked "Why are you harming me?" and stated unequivocally "I'm not resisting. I'm not resisting." Mr. White was not resisting.

53.   Mr. White repeatedly informed the officers that they were hurting him and that his arm was injured.

54.   Mr. White was surrounded by seven officers: Officer Ogden, physically restraining Mr. White; Officer Mahaffey, physically retraining Mr. White; Officer Cobb, physically restraining Mr. White; Sgt. Iwanicki watching; Officer Schreiber watching; Officer Hudelson watching; and Officer Kinda watching.

55.   Officer Ogden asked Mr. White "Will you walk outside?" and Mr. White acceded. He did not resist.

56.   Sgt. Iwanicki, Officer Schreiber, Officer Boehle, Officer Montez[3], and Officer Kinda watched on approvingly.

57.   On Sgt. Iwanicki's order Mr. White is marched outside.

58.   At no time did any officer intervene or intercede.

59.   Officers Schreiber, Boehle, Montez, Kinda, and Iwanicki were all within feet of Mr. White and all saw and heard the incident. Officer Montez stands the furthest away and looks on silently.

60.   Each of these officers either individually or collectively could have prevented either Mr. White's detention or the use of unnecessary force to a physically compliant arrestee but chose not to intervene.

61.   Mr. White never physically resisted and remained compliant throughout, while voicing protest to his treatment.

62.   Officer Ogden, following Sgt. Iwanicki's order, then forcefully marched Mr. White out of the Department lobby.

63.   This was all in view of Sgt. Iwanicki and all contrary to Department policy.[4]

64.   While being forcefully marched from the lobby, Mr. White remarked to Officer Ogden, "I smell alcohol on you; you've got alcohol on your breath!"

65.   On information and belief, Officer Ogden was incensed by Mr. White's verbal protests.

66.   Immediately, upon leaving the view of the lobby camera, and after informing Officer Ogden that Officer Ogden that Officer Ogden smelt of alcohol, Officer Ogden violently and with great force pinned Mr. White against a hot stucco wall. On information and belief, he intended to slam Mr. White's face against the wall and this was avoided only by Mr. White turning his face away from the wall. Officer Ogden was not recording using a

---

[3] Officer Montez does not stay in close vicinity to Mr. White after running out the door but watches the scene; Officer Boehle arrives outside after Mr. White has been handcuffed.
[4] Specifically, Department Policy 300.3, governing use of force.

body-worn camera in spite of department policies.[5]

67.   Sgt. Iwanicki, and Officers Cobb, Kinda, Schreiber, and Boehle proceeded to go outside where Officer Ogden was interrogating Mr. White.

68.   Officer Ogden became increasingly short tempered when Mr. White attempted to invoke his right to remain silent.

69.   Mr. White—a former California corrections officer—was familiar with his rights under California and federal law and familiar with the concept of "booking questions" and attempted to invoke his right to remain silent.

70.   Mr. White did not hinder his unlawful arrest or detention by refusing to answer Officer Ogden's questions—he was already arrested and detained: not being free to leave; shackled with handcuffs, violently manipulated at times by Ogden; and surrounded by Sgt. Iwanicki, and Officers Cobb, Kinda, Schreiber, and Boehle —; at no time did Mr. White interfere with any Officer's lawful duty nor did he physically resist arrest at any time.

71.   During all of the above interactions, Sgt. Iwanicki, and Officers Cobb, Kinda, Schreiber, and Boehle were present. Each Officer was in a position to intervene in the situation. None did. Sgt. Iwanicki, certainly could have put a stop to all of it, but never voiced concern with Mr. White's treatment.

72.   Eventually, Officer Ogden informed Mr. White that he was under arrest, at which point Officer Ogden assisted by Officer Kinda, forcefully marched Mr. White away, again using a pain compliance technique to force Mr. White's handcuffed arms backwards and skyward, doubling him over forcing his torso towards the ground. Despite the temperature—it was approximately 83 degrees Fahrenheit—Mr. White was placed in the back of a police car with the windows rolled up.

73.   Mr. White informed Officers Ogden and Kinda that they were hurting him loud enough for Sgt. Iwanicki, and Officers Cobb, Kinda, Schreiber, and Boehle to hear.

---

[5] Specifically, Department Policy 450.4 and 450.5, governing use of body-worn cameras

74.   All Officers were present, all Officers heard Mr. White's protestations of pain, all Officers were in a position to intervene; no Officer did.

75.   Again, Sgt. Iwanicki, despite his supervisory role did nothing.

76.   Mr. White was never given a breathalyzer or any field-sobriety tests prior to his detention and arrest.

77.   On information and belief, the only "cause" of Mr. White's arrest were his own protests and his speech.

78.   Mr. White was never read his Miranda rights.

79.   Mr. White arrived at the Yolo County Jail at approximately 3:00 PM.

## **Conduct of Officers and Department**

80. As Mr. White sat in the car, Officers Boehle and Schreiber endeavored to decide the cause of Mr. White's arrest.

81. At first, Officer Schreiber was unsure whether to pull a case number, to which Officer Boehle responded: "Nah, he's going to jail so pull a case number . . . Yeah, I mean, that's a guarantee."

82. They then began to determine why Mr. White was arrested.

83. Officer Schreiber asked Officer Mahaffey for his "aspect"—Officer Mahaffey described no criminal conduct and asked what Mr. White was arrested for.

84. Officer Boehle asked if Officer Mahaffey's interaction with Mr. White was "enough for 148?"[6]

85. Officer Mahaffey stated plainly, "*No.* I was just asking for him to speak with me outside and then Nate [Officer Mahaffey] came in and put him in an arm bar. So I'm like fuck that's something I ain't dealing with so . . ." Officer Mahaffey then shrugged

---

[6] California Penal Code Section 148 (criminalizing resisting, delaying, or obstructing peace officers in the lawful discharge of their duties.

raising his arms laughing.

86. To this, instead of releasing Mr. White or asking about intoxication or alcohol, Officer Boehle stated, "Okay, we'll go from there."

87. Officer Boehle, on information and belief, then left to consult with Officer Ogden. Only for the duration of conversation, Officer Boehle removed his body-worn camera and placed it on a desk.

88. Thereafter there was some guesswork on the part of Officers Boehle and Scheiber and Officer Boehle mentioned the odor of alcohol. After a brief conversation, Officers Boehle and Schreiber determined that Mr. White obstructed a police investigation because his Fifth Amendment rights did not apply. Officers Boehle and Schreiber literally struggled to concoct cause for Mr. White's arrest after the fact based on their legal opinions and incorrect views of constitutional protections—this post-arrest guess work constituted the cause and charges for Mr. White's arrest.

89. Officer Schreiber "did not see what happened" and did not know whether or not Mr. White smelled of alcohol.

90. Officer Schreiber proceeded to draft a narrative citing to Officer Ogden's then-nonexistent[7] Narrative to support the fact that he, Officer Schreiber, smelled the odor of alcohol on Mr. White.

91. On information and belief, Officer Schreiber's Narrative was based on no first-hand knowledge of Mr. White's behavior prior to his arrest and knowingly falsified as to the odor of alcohol.

92. Officer Ogden's Narrative, likewise contains numerous false statements, specifically relating to Mr. White and intoxication.

93. Year-on-Year, the Department publishes an annual report, touting the Department's

---

[7] Officer Ogden's Narrative did not get created until July 3, 2019 15:22; Officer Schreiber's Narrative is dated July 2, 22:26.

*perfect record* of application of force.

94. On information and belief, Current Police Chief Strange and Former Police Chief McDonald, are aware of these reports, ratify them, and agree with the statements made in such reports, *i.e.*, that there has been *no* inappropriate use of force. They either believe there is no problem or are completely indifferent as to its existence.

95. On information and belief the Department grossly understates the number of use of force incidents; the Department either disregards its own policies vis-à-vis reviewing every use of force, with the exception of "control holds [where] the suspect has no complaint of pain" or alternatively disregards its own definition of use of force.

96. On information and belief, the Department's review policy is consistently ignored and the review process is grossly inadequate.

97. The Department, has for all currently available published years found *no* out-of-policy use of force.

98. The Department's application of its reporting and review mechanism represents a practice and policy of the Department.

99. The use of force policy and its review policy has created a culture of absolute internal immunity in which Defendants' conduct is by no means abnormal but symptomatic of a pattern of behavior exhibited by the Department—there are well documented cases of the Department using excessive force, detaining without cause, falsifying reports, and failing to use recording devices:

100. In 2005, unarmed Fermin Galvan-Magana and his brother Ernesto Galvan-Magana were beaten by officers of the Department. In 2006, there was the *Beecham v. City of West Sacramento* incident. In 2006, there were three excessive force claims in the span of one month against Department Officer Fellows. In 2011, Aristeo Vasquez-Munoz, an unarmed man, was struck by batons wielded by multiple Department officers. In 2011-2012 Department Officer Alvarez engaged in multiple instances of sexual assault

to multiple women. In 2012, Department Officer Christopher Wright engaged in excessive force by shooting Kevin Hughey, an unarmed man in his home and was then subsequently allowed to fabricate an obviously false statement. Officer Wright never activated his recording device in this incident. Officer Tod Sockman assisted in trying to justify the unwarranted search of Kevin Hughey's home, and his wrongful shooting, lying about the existence of a warrant, thereby trying to create cause for Officer Wright's actions after the fact.

101. This was followed by a September 4, 2012, highspeed chase where Department Officer Markus hit and killed a pedestrian.

102. This was quickly followed by Officer Wright using force against another unarmed victim, Filipe Valdez.

103. That was yet again followed by a November 9, 2013 incident, where a large group of officers again used excessive force against the above mention Kevin Hughey.

104. This was followed by *Bonilla-Chirinos v. City of West Sacramento*, No. 2:15-cv-02564 (excessive force); followed by *Martinez v. City of West Sacramento*, No. 2:16-cv-02566 (false arrest, excessive force, falsification of evidence); followed by *Houston v. Gill*, No. 2:17-cv-00763 (excessive force); *Shipley v. Kulp*, No. 2:20-cv-2262 (false arrest and falsifying reports).

105. These cases are symptomatic of the Department's culture and an unwillingness to change—the continued behavior of impunity, skullduggery, and officer-inflicted violence is either approved of by the Department and the City of West Sacramento or alternatively the Department and the City of West Sacramento willfully ignore this pattern of abusive behavior and culture of indiscriminate violence.

106. Not only this, the Department actively claims *no* problem at all exists—it claims a perfectly compliant record for uses of force since at least 2014.

107. This is belied by a recent state suit of former Department Chief Thomas McDonald

claiming his own forced resignation was caused by his efforts to clean up the Department, specifically his unsuccessful attempt to hold officers accountable and put in place an *independent* review board.

108. On information and belief, this threat to the culture of violence and impunity resulted in an immediate backlash from the majority of the Department and ultimately resulted in former Department Chief McDonald losing his job.

**Detention in The Yolo County Jail**

109. Mr. White was reported as "one compliant" upon arriving at the Yolo County Jail (the "Jail").

110. Mr. White was ordered to remove his shoes and socks; however, Mr. White, being familiar with jails and the health risks of standing barefoot on the floors of such requested something clean to stand on.

111. Mr. White still had not been apprised of his Miranda rights, nor would he be at any point.

112. Mr. White had only recently been apprised of the reason for his arrest and immediately upon arrival at the jail requested a breathalyzer test.

113. Mr. White informed the admitting officer that he was a retired corrections officer and to avoid any safety concerns was originally placed alone clean cell.

114. After approximately 3 hours in this original cell an unknown corrections officer, Doe 1, removed Mr. White from the original cell, without apparent reason, and placed him in a cell without seating, which was filthy—there appeared to be dried blood, fecal matter, and urine in the cell. Mr. White spent approximately three hours in this cell prior to being breathalyzed. The test confirmed there was no alcohol in Mr. White's system—Mr. White had declined two tests because the mouthpiece was already attached to the breathalyzer and Mr. White feared it being unclean.

115. Mr. White spent approximately 8 and a half hours in the second, filthy, cell absent

reason, seating or medical attention; Mr. White was kept in this cell from approximately 6:30 PM to 2:45 AM the following morning.

116. On information and belief Mr. White suffered a fungal infection as a result of being held in this cell and exposed to its conditions, to wit, what on information and belief was human waste.

117. At approximately 10:30 PM Mr. White was finally booked and printed.

118. Throughout his stay in the Jail multiple officer's witnessed Mr. White holding his left arm; indeed, he winced in pain when his left set of fingerprints were taken and had asked for medical attention—specifically to be given a sling.

119. After being booked, Mr. White remained in the second cell for approximately four more hours.

120. At approximately 2:30 AM, on July 3, 2019, an officer asked Mr. White if he would like to go home. Mr. White was then released at approximately 3:00 AM and left the facility at approximately 3:45.

## Conduct of Sherriff's Department and Corrections Officers

121. On information and belief, Sheriff Lopez is the final decision maker on policies relating to training of corrections officers and the implementation of those policies in the Yolo County Jail.

122. On information and belief, Sheriff Lopez was responsible for the training, supervision, and discipline of Officer Santos and Doe 1. Additionally Sheriff Lopez was responsible of the promulgation and implementation of the policies and procedures as they related to the treatment of arrestees in the custody of the Yolo County Sheriff's Department.

123. Since at least 2009, the Yolo County Sheriff's department has been aware of constitutionally significant inadequacies in the treatment of arrestees, specifically those

requiring medical attention.

124. In 2009, Robert Vega, Jr., brought a complaint against the Yolo County, arguing claiming *inter alia* that corrections officers were inadequately trained and supervised in relation to seeking medical attention of those under their custody.

125. On information and belief, Yolo County, through then-Sheriff E.G. Prieto and current Sheriff Lopez failed to alter policies, training, supervision, and custom to correct this problem despite having knowledge of correction officers actions and inactions as they related to treatment of arrestees and inmates.

126. On information and belief, there continues to be a custom of refusing or delaying medical treatment of arrestees and persons held in the Yolo County Jail.

**Aftermath**

127. Neither the City and Police Defendants nor the Yolo County Defendants cared for, examined, asked about, or sought to assist in the treatment of Mr. White's injuries.

128. Mr. White made his injuries known to each and every named defendant—stating multiple times that he was injured.

129. As a result of the pain compliance techniques employed by Officer Mahaffey, Officer Ogden, and Officer Kinda and the inaction of the Yolo County Defendants Mr. White suffered significant pain as well as shoulder injuries.

130. Mr. White was prescribed Tramadol, Nembutol, and Lidocaine patches for the continued pain in his left shoulder. Each of these medications works to reduce pain.

131. Mr. White continues to take various pain medications as a result of his shoulder injury.

132. As a result of his shoulder injury Mr. White could not drive for some weeks, can no longer play the guitar without pain, no longer can raise his left arm higher than 90 degrees, continues to require physical therapy, and has decreased mobility which will continue for the rest of his life.

133. Further, as a result of the incidents, Mr. White has been diagnosed with depression, anxiety, and post-traumatic stress disorder. He has been prescribed Lexapro and Escitalopram and continues to attend therapy

134. Mr. White never was prescribed medicine to treat with any mental or psychological disorder prior to the event; never suffered from any mental or psychological disorder prior to the event; and never required any mental health treatment.

135. The above noted psychological diagnoses and conditions were caused by the events Described above and the Defendants' actions.

136. There is a significant likelihood of future harm absent injunction. During this incident, the Officers of the Department arrested Mr. White without cause and falsified charges after the arrest. The Officers could very well arrest Mr. White without cause again and again concoct "cause." Mr. White has no plan to move away from West Sacramento.

137. Mr. White has suffered irreparable bodily injury due to this incident. ¶ 129-35. If Mr. White is again arrested without cause and with excessive force, it will likely cause further irreparable damage to Mr. White's body.

### FIRST CAUSE OF ACTION

**Fourteenth Amendment—Pretrial Due Process, 42 U.S.C. § 1983**

*(against Deputy Santos, in his official and individual capacity; Doe 1, in his official and individual capacity)*

138. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties), paragraphs 109-120 (Detention in The Yolo County Jail), paragraphs 121-126 (Conduct of Sherriff's Department and Corrections Officers) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

139. At all pertinent times Deputy Santos and Doe 1 were acting under color of law.

140. On information and belief, Deputy Santos and Doe 1 were aware of the charges brought against Plaintiff and harbored ill intent towards Mr. White.

141. With the intent to punish Mr. White for resisting arrest and or obstructing arrest—Deputy Santos and Doe 1 (collectively "Corrections Officers") moved Mr. White from a clean and comfortable cell to one lacking any seating, which was both unclean and insalubrious.

142. On information and belief, Corrections Officers were aware of Mr. White's sensitivity to cleanliness and desire to avoid conditions which may have been unhealthy.

143. On information and belief, Corrections Officers, knew of Mr. White's requests aimed at hygiene; to wit, his reluctance to be exposed to unclean floors and for a clearly unused breathalyzer mouthpiece.

144. On information and belief, Corrections Officers, knew Mr. White was in pain and purposefully delayed both Mr. White's release and booking simply to keep him in unhygienic, painful, and unhealthy conditions—Mr. White asked for a sling and multiple times informed Corrections Officers of his shoulder injury.

145. On information and belief, this was done solely to cause Mr. White harm—to punish Mr. White.

146. These decisions were deliberate and purposeful.

147. These decisions led to independent injury—namely, a fungal infection of both feet—and worsened the injury Mr. White sustained to his shoulder by delaying treatment.

148. Corrections Officers denied Mr. White medical care or alternatively were deliberately indifferent to his need for medical care.

149. No reasonable persons in the Corrections Officers' places would have acted in a similar manner.

150. As a result of the Corrections Officers conduct, Mr. White suffered physical pain,

physical injuries, suffered severe emotional and mental distress, incurred medical expenses, will likely incur future medical expenses, and the quality of his life has diminished.

151. None of the above actions were reasonable; and the above actions were the proximate cause of Mr. White's injuries complained of herein.

## SECOND CAUSE OF ACTION

### Fourteenth Amendment—Failure to Train 42 U.S.C. § 1983

*(against Sheriff Lopez, in his official capacity; and Yolo County)*

152. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties), paragraphs 109-120 (Detention in The Yolo County Jail), paragraphs 121-126 (Conduct of Sherriff's Department and Corrections Officers) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

153. As stated above, Sheriff Lopez was responsible for the training, supervision, and discipline of Officer Santos and Doe 1.

154. Further, Sheriff Lopez had knowledge of a pre-existing custom that continued from 2009—specifically, the indifference of corrections officers to the pain of arrestees, their conditions, and the need to seek prompt medical attention.

155. Yolo County had what amounted to a custom of ignoring or delaying medical care regardless of the seriousness of the injury and ignoring the conditions in which arrestees were held. Sheriff Lopez was aware of this custom and failed to take corrective action or to implement sufficient training policies to address the need for prompt medical care of arrestees.

156. This failure to adequately train amounted to deliberate indifference and proximately caused Plaintiff's aforementioned injuries specifically: physical pain, physical injuries, severe emotional and mental distress, medical expenses, likely future medical

expenses, and diminished quality of life.

157. Mr. White was at the time of his arrest a law-abiding citizen who had committed no crime.

## THIRD CAUSE OF ACTION

### Fourth Amendment—Excessive Force, 42 U.S.C. § 1983

(*against Officer Mahaffey, in his official and individual capacity, Officer Ogden, in his official and individual capacity, Officer Kinda, in his official and individual capacity, Officer Cobb, in his official and individual capacity, and City of West Sacramento*)

158. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

159. Officers Mahaffey, Ogden, Kinda, and Cobb each used unreasonable force in physically restraining and seizing Mr. White and were at all pertinent times acting under color of law.

160. Mr. White presented no threat and had committed no crime; there was no reason to use any physical force against him.

161. The use of the force against Mr. White was both intentional and objectively unreasonable—again, there was no reason to seize Mr. White so the use of any force was unreasonable.

162. Officer Ogden, Officer Mahaffey, and Officer Cobb jointly placed Mr. White in an "arm lock". They observed that Mr. White had committed no crime, that Mr. White was not a threat, and that Mr. White was not resisting or evading arrest. They performed the "arm lock" without any reason, without first giving warning of their intention, and did not use less intrusive techniques such as requesting Mr. White to

comply with being handcuffed. Officers Kinda and Ogden repeatedly used pain compliance techniques without any reason, without first giving warning, and did not use available less intrusive techniques such as leading Mr. White absent physical force.

163. Mr. White was not free to leave, nor would have any reasonable person in that situation believed he was free to leave and Mr. White was physically restrained.

164. Mr. White was in no way physically resisting and he on multiple occasions stated that his shoulder was injured and the officers were causing him pain.

165. Officers Mahaffey, Ogden, Kinda, and Cobb, all acted knowingly and with malice, or alternatively with deliberate indifference to Mr. White's constitutional rights.

166. No reasonable officers in their place would have acted in a similar manner.

167. In view of Mr. White's and others' incidents, the City of West Sacramento had what amounted to a permanent and well-settled culture and custom of impunity, malice or reckless disregard vis-à-vis the use of excessive force. Such custom, culture, or policy proximately caused the acts complained of in the instant Cause of Action.

168. This collective actions of the City of West Sacramento and Officers Ogden, Mahaffey, Kinda, and Cobb caused: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

## FOURTH CAUSE OF ACTION

### Fourth Amendment—False Arrest, 42 U.S.C. § 1983

(*against Officer Mahaffey, in his official and individual capacity, Officer Ogden, in his official and individual capacity, Officer Kinda, in his official and individual capacity, Officer Cobb, in his official and individual capacity, and City of West Sacramento*)

169. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and

Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

170. Officers Mahaffey, Ogden, Kinda, and Cobb, each assisted in placing Mr. White in custody and each were acting under color of law.

171. There was no probable cause to detain or arrest Mr. White for any crime.

172. Mr. White was found innocent of all charges arising from the arrest and committed no crime.

173. Each of the Officers named above knew that there was no reason to arrest Mr. White and knowingly and with evil motive or intent violated his constitutional rights, or alternatively acted with deliberate and reckless indifference to Mr. White's constitutional rights.

174. In view of Mr. White's and others' incidents, the City of West Sacramento had what amounted to a permanent and well-settled culture and custom of impunity, malice or reckless disregard vis-à-vis the use of false arrest. Such custom, culture, or policy proximately caused the acts complained of in the instant Cause of Action.

175. The collective actions of the City of West Sacramento and Officers Ogden, Mahaffey, Kinda, and Cobb caused: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

## FIFTH CAUSE OF ACTION

### Fourteenth Amendment—Equal Protection, 42 U.S.C. § 1983

*(against Officer Mahaffey, in his official and individual capacity, Officer Ogden, in his official and individual capacity, Officer Kinda, in his official and individual capacity, Officer Cobb, in his official and individual capacity, and City of West Sacramento)*

176. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

177. Officers Ogden, Mahaffey, Kinda, and Cobb, acting under color of law, arrested and used unreasonable force against Mr. White. This was not done to Mr. King; indeed, no action was taken against Mr. King despite him threatening Mr. White.

178. Mr. King is white; Mr. White is non-white and ethnically, and male.

179. On information and belief, Officers Ogden, Mahaffey, Kinda, and Cobb, selectively enforced and applied the law and physical force unequally specifically because of Mr. White's race. Specifically, on information and belief, the officers' only source of information about Mr. White's conduct in the lobby were white and/or female persons who reported that Mr. White was being aggressive and threatening, the officer's direct observation and Mr. White's statements. The officers discriminatively credited the white and/or female sources, over their own direct observation of Mr. White and Mr. White's statements, first because the sources are white and/or female and Mr. White is perceived as a Black male, who are untrustworthy according to wide-spread racial tropes, and second because Mr. White is perceived as a Black male, who according to wide-spread racial tropes are angry, aggressive and threatening without justification.

180. The four Defendants acted with malice or alternatively with reckless disregard as to Plaintiff's civil rights.

181. In view of Mr. White's and others' incidents, the City of West Sacramento had what amounted to a permanent and well-settled culture and custom of impunity, malice or reckless disregard vis-à-vis the selective enforcement of law against Black male. Such custom, culture, or policy proximately caused the acts complained of in the instant

Cause of Action.

182. As a collective result of Officers Ogden, Mahaffey, Kinda, and Cobb and the City of West Sacramento caused: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

## SIXTH CAUSE OF ACTION

### First Amendment—Retaliation, 42 U.S.C. § 1983 against

*(Officer Ogden, in his official and individual capacity, Officer Boehle, in his official and individual capacity)*

183. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

184. Plaintiff made multiple comments—quoted above—relating to alcohol and Officer Ogden. Plaintiff also made multiple comments to Officer Boehle about the police department, which Officer Boehle tried but could not deny.

185. Such comments were truthful, non-defamatory, and protected speech.

186. Because of Mr. White's comments, Officer Ogden retaliated against Mr. White; specifically, by detaining, threatening to arrest, and arresting Mr. White and by inflicting physical pain on Mr. White. Officer Ogden slammed Mr. White against a wall shortly after Mr. White made such comments and used pain compliance techniques against Mr. White. These actions came immediately after Mr. White's comments and were taken to chill Mr. White's from continuing to comment. These actions would chill a person of ordinary firmness from continuing to engage in

protected activity.

187. Because of Mr. White's comments, Officer Boehle also retaliated against Mr. White. Specifically, Officer Boehle first decided that he wanted to send Mr. White to jail for one reason or another; thereafter, he struggled to concoct two criminal charges against Mr. White. Other officers who viewed the arrest had told Officer Boehle that Officer Ogden did not have a probable cause to arrest Mr. White. Not satisfied by those answers, Officer Boehle removed his body-worn camera against departmental policy to talk to Officer Ogden in secret to concoct the two criminal charges against Mr. White, which are not supported by probable cause.

188. Officer Ogden and Officer Boehle, each acting under color of law, did this knowingly, and maliciously to injure Mr. White's First Amendment rights. Alternatively, the officers acted with deliberate and reckless indifference to Mr. White's constitutional rights. But for Mr. White's comments, Officer Ogden would not have arrested Mr. White without probable cause and Officer Boehle would not have concocted false charges against Mr. White.As a result of Officers Ogden's actions Mr. White suffered: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

## SEVENTH CAUSE OF ACTION

### Fourteenth Amendment—Failure to Intervene, 42 U.S.C. § 1983

*(against Officer Iwanicki, in his official and individual capacity, Officer Schreiber, in his official and individual capacity, Officer Montez, in his official and individual capacity, Officer Boehle, in his official and individual capacity, and City of West Sacramento)*

189. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108

(Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

190. Sgt. Iwanicki, Schreiber, Montez, and Boehle, all acting under color of law, were present for and saw the acts complained of in actions three through six.

191. Each of these individual Defendants saw and heard the actions being taken by their fellow officers.

192. Each of these individual Defendants could have intervened to prevent the clear violations of well-defined constitutional rights and chose not to.

193. Were any one of these officers to have intervened these violations could have been prevented—each was in a position where his intervention could have prevented constitutional injury to Plaintiff.

194. No officer did. The officers' failure to intervene was motivated by malice or involved a reckless or callous indifference to the constitutional rights of others.

195. In view of Mr. White's and others' incidents, the City of West Sacramento had what amounted to a permanent and well-settled culture and custom of impunity, malice or reckless disregard vis-à-vis the police officers failure to intervene in other police officers' injuring others' constitutional rights. Such custom, culture, or policy proximately caused the acts complained of in the instant Cause of Action.

196. As a result of each of the Defendant's failures to intervene Mr. White suffered: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

## EIGHTH CAUSE OF ACTION

### Battery, California Common Law

(*against Officer Ogden, in individual capacity, Officer Mahaffey, in his individual capacity, Officer Kinda, in his official and individual capacity, Officer Cobb, in his individual*

*capacity)*

197. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

198. Officer Ogden, Officer Mahaffey, Officer Kinda, and Officer Cobb all intentionally or maliciously harmed Plaintiff through physical contact.

199. At no time did Plaintiff consent to any such content; indeed he verbally protested against the same contact.

200. Such contact was the proximate cause of significant pain and injury to Mr. White.

201. To this day Mr. White continues to experience pain and permanent loss of mobility.

202. Mr. White continues to accrue costs directly associated with these injuries.

## NINETH CAUSE OF ACTION

### *Bane Act—California Civil Code § 52.1*

*(against Officer Ogden, in his official and individual capacity, Officer Mahaffey, in his official and individual capacity, Officer Kinda, in his official and individual capacity, Officer Cobb, in his official and individual capacity, and City of West Sacramento)*

203. Plaintiff re-alleges and incorporates by reference paragraphs 1-22 (Nature of the Action, Jurisdiction, Venue, Parties) paragraphs 23-36 (Personal Background and Biography), paragraphs 37-79 (Incident and Arrest of July 2, 2019), paragraphs 80-108 (Conduct of Officers and Department) and paragraphs 127-137 (Aftermath) of this Second Amended Complaint.

204. Officer's Ogden, Mahaffey, Kinda, and Cobb, and City of West Sacramento each violated Mr. White's clearly established First, Fourth, and Fourteenth Amendment

rights, as adumbrated above. No reasonable officer would have acted in the way they acted. Mr. White's detention and arrest was clearly absent probable cause; further, they were in retaliation of Mr. White exercising his right to free speech. Lastly, the force used by the above-named officers was facially unreasonable and excessive.

205. The City of West Sacramento is vicariously liable for its agents' (the officers) actions violated Mr. White's constitutional rights as adumbrated above.

206. Mr. White's detention and arrest were by their very nature intimidating and coercive.

207. Each Officer and the City of West Sacramento acted maliciously and deliberately to interfere with Mr. White's clearly established constitutional rights.

208. As a result of each of the Defendant's violation of Mr. White's constitutional rights, Mr. White suffered: physical pain, physical injuries, severe emotional and mental distress, significant reputational damage, medical expenses, likely future medical expenses, and diminished quality of life.

**WHEREFORE**, Plaintiff requests judgment as follows:

A.  Compensatory, general and special damages against each Defendant, to the extent permitted by law, according to proof at trial, of $3,800,000 in aggregate;

B.  Punitive damages against individually named Defendants in the amounts specified and to be apportioned as specified in Exhibit A;

C.  For injunctive relief against the City of West Sacramento, requiring the City of West Sacramento to put in place independently run, mandatory officer training on constitutional practices as they relate to arrest, detention, use of force, de-escalation, necessity of force, truthfulness in reporting, retaliation, discrimination, and custody, to prevent future harm to Plaintiff and other innocents;

D.  For injunctive relief against the County of Yolo, requiring the County of Yolo to put in place independently run, mandatory officer training on constitutional practices as they relate to medical treatment, humane supervision, detention, use of force, sanitation, discrimination, and custody, to prevent future harm to Plaintiff and other citizens;

E.  For permanent injunctive relief against the City of West Sacramento enjoining all agents and employees of the city from further violating Plaintiff's constitutional rights;

F.  For reasonable attorneys' fees as provided by law, including but not limited to 42 U.S.C. § 1988 and Cal. Civil Code § 52.1

G.  For costs of the suit; and

H.  Granting Plaintiff any such other and further relief as this Court Deems just and Proper.

DATED: April 21, 2022

By _____
Zachary Lawrence
Lawrence Law Firm PLLC
598 E Main Street
Little Falls, NY 13365
*Attorney for Petitioner: Robbie D. White.*